## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Kim Miles,<br><br>          Plaintiff,<br><br>v.<br><br>Northcott Hospitality International, LLC,<br><br>          Defendant. | Case No. 12-cv-1163 (SRN/JJG)<br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Clayton D. Halunen, Jacob Frey, and Ross D. Stadheim, Halunen & Associates, 1650 IDS Center, 80 South Eighth Street, Suite 1650, Minneapolis, Minnesota 55402, for Plaintiff.

Kevin M. Mosher, Jodee K. McCallum, and James S. Reece, Thompson Coe, 408 Saint Peter Street, Suite 510, Saint Paul, Minnesota 55102, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment [Doc. No. 13], which was heard on May 17, 2013. In her Complaint, Plaintiff asserts claims of discrimination based on sex in violation of the Minnesota Human Rights Act (Count 1); disability discrimination in violation of the Minnesota Human Rights Act,[1] failure to accommodate, and hostile work environment based on disability (Count 2); and reprisal discrimination in violation of the Minnesota Human Rights Act (Count 3), against her

---

[1] On March 29, 2013, Plaintiff withdrew her disability discrimination claim in violation of the Americans with Disabilities Act. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 36 [Doc. No. 20].)

former employer, Northcott Hospitality International, LLC. (Compl. ¶¶ 26-46 [Doc. No. 1-1].) For the reasons that follow, the Court denies Defendant's summary judgment motion.

## II. BACKGROUND

### A. Kim Miles' and Nasir Raja's Work Histories at Northcott

Defendant Northcott Hospitality International, LLC ("Northcott"), headquartered in Chanhassen, Minnesota, develops and operates restaurant and lodging operations throughout the United States. (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 4 [Doc. No. 15].) Along with its Perkins and Houlihan restaurants, Northcott owns the AmericInn Hotel franchise. (Id.)

On September 7, 2010, Plaintiff Kim Miles ("Miles") began working at Northcott. (Dep. of Kim Marie Miles at 22 [Doc. No. 22-5].) As a Business Manager, Ms. Miles trained and assisted AmericInn franchisees—approximately fifty-one properties in total—on implementing the brand's standards and franchisee service programs. (Ex. J to Aff. of Kevin M. Mosher [Doc. No. 16-1]; Compl. ¶ 6.) Ms. Miles' responsibilities included marketing for hotels, training hotel staff, facilitating the opening of new properties, inspecting properties, enforcing brand standards, liaising between Northcott department and hotel franchisees, and fielding any issues facing franchisees. (Comp. ¶ 6.) The majority of Ms. Miles' work required travel. (Ex. J to Aff. of Kevin M. Mosher at 3 [Doc. No. 16-1].) In 2010, Ms. Miles received positive performance reviews from her supervisor at the time, John Synstegaard, and complimentary comments from CEO Paul Kirwin and clients. (Miles Aff. ¶¶ 3-4 [Doc. No. 23].)

On February 22, 2010, Nasir Raja began his employment at Northcott. (Dep. of

Nasir Raja at 6 [Doc. No. 22-4].) In February 2011, Mr. Raja was promoted to Senior Vice President of Franchise Operations and became Ms. Miles' supervisor. (Id. at 26, 28.) With a background in consulting, Mr. Raja used an improvement methodology called Six Sigma, which aims to eliminate all waste in organizations. (Id. at 7-9.) At the time of his promotion, Mr. Raja supervised eight employees: Scott Doble, Jessica Rogers, Susan Jespersen, Mary Tjenstrom, Jenny Heger, Jeff Pascua, John Synstegaard, Carrie Bushman, and Kim Miles. (Id. at 27.) Soon after Mr. Raja's promotion, Ms. Miles asked him to increase her responsibilities, which he did. (Miles Dep. at 99.) As a result, compared with other Business Managers, Ms. Miles had more work than Mike Welcher, approximately the same as Jeff Pascua, and less than Jessica Rogers. (Id.)

Between Ms. Miles' date of hire and eventual departure, Ms. Miles neither experienced any decrease in pay or benefits, nor was she denied a promotion or raise. (Id. at 104-105.)

**B. Ms. Miles' First Complaint of Discrimination**

Shortly after Mr. Raja's promotion, Ms. Miles began to have concerns regarding his treatment of women in the office. In May 2011, Ms. Miles told Mr. Raja that she felt he was "genderly harassing me [Ms. Miles]." (Miles Dep. at 31-32, 34.) Ms. Miles alleges that Mr. Raja then looked at her and said, "right now I trust you about zero percent. Now I have to go tell Paul [Kirwin, CEO] and Brian [Schwen, CFO] that you think I'm harassing you." (Id. at 103.) Ms. Miles allegedly responded, "I'm not saying you are, but I feel that. That's how I feel. And he [Mr. Raja] said, this conversation is done." (Id.) In the weeks and months following this conversation, Ms. Miles felt that Mr. Raja was "pretty rough"

3

with her.  (Id. at 32.)  For example, in a meeting with Ms. Miles, Mr. Raja allegedly

> . . . put his hands up—both hands up in front of my [Ms. Miles'] face and said stop and shut up.  And then he got up and stood behind his chair and said I was a disgrace, I should be ashamed of myself.  He said a few more things.

(Id. at 33.)  This meeting allegedly stemmed from a complaint by Jessica Rogers to Mr.

Raja about a comment Ms. Miles said to her in April 2011.[2]  (Id. at 33-35.)

### C. Ms. Miles' First Performance Review Under Mr. Raja and Her Second Complaint of Discrimination

After his promotion, Mr. Raja created a performance evaluation form called the

Northcott Achievement Plan ("NAP").  (Raja Dep. at 31.)  The NAP formalizes

conversations regarding employee performance between supervisors and employees,

providing separate spaces for their respective comments.  (Id. at 35-37.)  Employee

objectives are created at the beginning of the year, monitored, and reviewed in the middle of

and at the end of the year.  (See Ex. 5 to Aff. of Ross D. Stadheim [Doc. No. 21-5].)

In August 2011, Ms. Miles issued her mid-year NAP.  (Id.)  Ms. Miles and Mr. Raja

disagreed in the "Team Player" section.  (Id.)  Whereas Ms. Miles felt she was a "great team

player," Mr. Raja wrote that Ms. Miles "brought negativity" and "drama" to the team.  (Id.

at KM000182.)  Following the practice when a supervisor and employee disagree on a

section, Mr. Raja and Ms. Miles put together a revised action plan.  Mr. Raja concedes that

---

[2] Ms. Miles alleges that Mr. Raja had asked the business managers to read a self-help book and take a personality test.  (Miles Dep. at 34.)  Ms. Rogers was allegedly upset by her results because they "came back as soft, positive . . . nice.  And she [Ms. Rogers] was very upset by that" because she felt that as "a VP," she should not be a nice person.  (Id. at 34-35.)  In April 2011, Ms. Miles allegedly told Ms. Rogers that it was "okay to be soft," which Ms. Rogers took as an insult.  (Id. at 35.)  Ms. Rogers then told Mr. Raja that Ms. Miles "had cut her down."  (Id.)

he forced Ms. Miles to write the following in the first person:

> In the past a few of my team members have felt my negativity and the bringing of politics to the team. My action plan is to focus on myself and not be so competitive. Always put my team first and have a positive attitude.

(Id.; Raja Dep. at 68.)

On August 8, 2011, Ms. Miles made her second complaint of discrimination—this time to Jean Wall, Human Resources Director. (Dep. of Jean Wall at 30 [Doc. No. 22-6]; Ex. 15 to Aff. of Ross D. Stadheim [Doc. No. 22-3].) Ms. Miles alleged that Mr. Raja was harassing her and setting her up for termination. (Wall Dep. at 30- 31.) Miles also asked about the "legality" of signing her mid-year NAP because she "didn't agree with it." (Miles Dep. at 168.) After this meeting, Ms. Miles followed up with Ms. Wall between two and four times. (Id. at 165-66.) Ms. Miles also gave Ms. Wall an envelope containing a three-page letter, dated August 19, 2011, which addressed some of the concerns that Ms. Miles had raised previously with Ms. Wall. (Wall Dep. at 40.) As the envelope to the letter was labeled, "[p]lease only open on my [Ms. Miles'] permission," it remained unopened in her personnel file until Ms. Miles asked for its return in January 2012. (Id. at 41; Ex. EE to Aff. of Kevin M. Mosher [Doc. No. 16-2].)

After Ms. Miles made her report, Ms. Wall allegedly stated that Mr. Raja "isn't doing anything illegal," and Ms. Miles responded, "yes, he is, he's doing gender harassment." (Miles Dep. at 166.) Ms. Wall said that she would talk to the CFO, Brian Schwen. (Id.) Northcott did not investigate the validity of Ms. Miles' allegations. (Wall Dep. at 39-40.)

In addition to reporting Mr. Raja's discriminatory treatment to Ms. Wall, Ms. Miles

spoke with three vice presidents at Northcott: Mark Clarey, Ron Burgett, and John Synstegaard. (Miles Dep. at 70-71.) Ms. Miles' discussion with Mr. Clarey focused on how Mr. Raja treated her and the likelihood of transferring to Mr. Clarey's department. (Id.) Mr. Clarey told Ms. Miles that she needed to "do whatever I [Ms. Miles] needed to take care of myself." (Id. at 71.) Ms. Miles also spoke with her former supervisor, Mr. Synstegaard, about Mr. Raja's differential treatment. (Id.) Mr. Synstegaard advised Ms. Miles to find another position because Mr. Raja's behavior would never change. (Id.) Mr. Burgett was allegedly aware of how Mr. Raja treated women. He and another employee— Shawn Lidberg, a supervisor in the construction department—advised Ms. Miles to report Mr. Raja because what he was doing was "illegal." (Id. at 71-72.)

### D. Ms. Miles' Diagnosis of Meniere's Disease in Her Right Ear

On January 16, 2012, Ms. Miles was diagnosed with Meniere's disease in her right ear, resulting in seventy to seventy-five percent hearing loss in that ear. (Miles Dep. at 47-48.) Ms. Miles was diagnosed with the same disease in her left ear approximately ten years ago, which resulted in complete hearing loss in the left ear. (Id. at 169.) Ms. Miles currently uses a powerful hearing aid to cope with her disability. (Id. at 48.) Northcott does not dispute that Ms. Miles suffers from a disability. (Raja Dep. at 83; Wall Dep. at 40.)

Mr. Raja testified that he first learned of Ms. Miles' hearing disability in January 2012, when Ms. Miles told him that she was having a hard time hearing, was going to the doctor, and might need a hearing aid. (Raja Dep. at 84.) On January 18, 2012, Ms. Miles informed Mr. Raja of her diagnosis. (Miles Dep. at 50-51.) Ms. Miles told Mr. Raja that her physicians were hoping that it was a tumor that could be removed to restore her hearing.

(Id.)  In response, Mr. Raja "giggled and laughed."  (Id. at 51.)  Mr. Raja also allegedly said, "I'm going to take off my employer hat and put on my coach hat and just tell you I think maybe it's time you quit."  (Id.)

The next day, Mr. Raja removed Ms. Miles from her extra projects because she "was not able to fulfill what was expected of her."  (Raja Dep. at 101-102; Miles Dep. at 64.)  Mr. Raja denied removing her from these projects because of her hearing issues.  (Raja Dep. at 101.)  Mr. Raja also took away some of the properties assigned to Ms. Miles.  (Miles Dep. at 64.)  Before Ms. Miles' diagnosis, they had not discussed the possibility of Ms. Miles losing some of her properties.  (Id.)  Later that month, Mr. Raja removed Ms. Miles from her video shoot project.  (Id. at 195.)  Ms. Miles alleges that she had never had projects taken away from her previously.  (Id. at 64.)  In addition, Jessica Rogers allegedly degraded Ms. Miles on account of her hearing loss.  (Id. at 55-56.)  Ms. Miles alleges that Ms. Rogers would tell co-workers, "don't bother talking to [Ms. Miles], she can't hear you anyway," and she would throw items at Ms. Miles to get her attention.  (Id.)

### E.  Ms. Miles' Requests for Reasonable Accommodation

Before her diagnosis of Meniere's disease in her right ear, Ms. Miles asked Mr. Raja to sit next to her on her right side during team meetings, because she had difficulties hearing in large rooms that echoed.  (Miles Dep. at 54.)  Mr. Raja allegedly stated that "he would do his best but he couldn't promise it."  (Id.)  Ms. Miles commented that "it was like he almost made it a point to sit the farthest away from me when I asked him two different times to sit next to me."  (Id.)  Ms. Miles also asked Mr. Raja if she could listen to webinars in her cubicle, where she had access to an ear bud, rather than in a conference room that echoed.

(Id. at 62.)  Ms. Miles told Mr. Raja that she needed this accommodation because of her hearing loss.  (Id. at 62-63.)  Mr. Raja denied this request as well because he wanted everyone in the conference room.  (Id.)

In January 2012, shortly after Ms. Miles informed Mr. Raja about the Meniere's diagnosis in her right ear, Ms. Miles asked Mr. Raja and Ms. Wall for an accommodation to work from home.  (Raja Dep. at 84; Wall Dep. at 53-54.)  This request, too, was denied. (Wall Dep. at 54.)

When asked whether Northcott had engaged in any interactive process to determine if working from home was feasible, Ms. Wall stated that she had not.  (Id.)  Mr. Raja confirmed the same:

> Q:    Did you ever engage in any sort of interactive process with Ms. Miles to determine whether working at home could be an option or did you just blanketly say no?
>
> A:    Blanketly say no.  I wanted her to work from the office, yes.
>
> . . .
>
> Q:    Did you ever engage in an interactive process with Ms. Miles to determine whether she could, in fact, work from home and still complete all of her tasks?
>
> A:    Short answer, no.
>
> Q:    Did you ever consider restructuring Ms. Miles'[sic] job to accommodate her?
>
> A:    No.
>
> Q:    Did you ever consider maybe a part-time or a modified work schedule to accommodate her disability?
>
> A:    No.

8

(Raja Dep. at 88-89.)  Mr. Raja explained that it was the "company culture" to work from the office, and that if he granted Ms. Miles' request, he would have to allow others as well. (Id. at 85-86.)  Mr. Raja stated that he did not consider restructuring Ms. Miles' job or work schedule to accommodate her disability.  (Id. at 89.)

On February 13, 2012, Ms. Miles updated Mr. Raja and Ms. Wall on her diagnosis via email.  (Ex. 11 to Aff. of Ross D. Stadheim at N004103 [Doc. No. 21-11].)  In this email, Ms. Miles explained that she could not hear her telephone ring and that she heard only approximately one-fourth of what was said in meetings.  (Id.)  Mr. Raja wrote in response:

> . . . If you don't feel well and cannot come into work, then you should take sick days off.  You will have to work with Jean to make sure that works with your request for leave.  If you feel well and can work, then you will need to come into the office.  As I mentioned to you, I will make sure to accommodate you in any way I can.  I will try my best to make the work environment comfortable for you.  You will have to help me by letting me know what you need.  I, as well as your team, will be happy to work with you.

(Id. at N004102.)  Ms. Miles felt that Mr. Raja's offer to accommodate her was an empty one, given his failure to accommodate her previous requests and his practice of saying one thing and writing another in his emails.  (Miles Dep. at 221.)

**F.  Ms. Miles' Third Complaint of Discrimination**

In January 2012, Ms. Miles completed her year-end review for 2011.  (Ex. M to Aff. of Kevin M. Mosher at KM000191 [Doc. No. 16-1].)  Under her performance for "Team Player," Ms. Miles stated her belief "that my communication with my supervisor is on a much higher level and has made a 180 degree turn to the better[.]  This is one area where I

have made a 150% improvement." (Id. at KM000201.)  Ms. Miles qualified her interactions with Mr. Raja as having improved "only in December" of 2011 because he "just kind of laid off me and ignored me" and "there wasn't as much harassment.  Of course, I traveled, too. So I just—I felt that I did what I was supposed to do, and I made a 180-percent turn of what he said I had to do from the mid-year NAP."  (Miles Dep. at 138.)

In February 2012, Ms. Miles met with Ms. Wall again, telling her that Mr. Raja was "back at it again."  (Id. at 182.)  On February 6, 2012, Ms. Miles sent a lengthy email to Ms. Wall and Mr. Kirwin.  (Ex. 6 to Aff. of Ross D. Stadheim [Doc. No. 21-6].)  The letter repeated Ms. Miles' previous complaints, such as Mr. Raja's differential treatment of women in her department and that he was setting up Ms. Miles for failure.  (Id.)  Ms. Miles also reported discrimination on the basis of her disability.  (Id.)

Mr. Raja's notes document that on February 1, 2012, he "[t]alked to [CEO] Paul during my status meeting.  Paul advised that I should not make the move till I have a replacement.  I did explain the whole situation with her.  He did advise me to work with Brian and Matt.  And that given Kim's style that we should expect some retaliation or reaction."  (Ex. 9 Aff. of Ross D. Stadheim [Doc. No. 21-9].)  Mr. Raja also stated that his "mind [was] made up that Kim had to be transitioned."  (Id.)  Mr. Raja indicated that he had lost confidence in Ms. Miles; that he "worried about her ability to do any high profile and critical project"; and that Ms. Miles' performance was between "unacceptable" and "needs improvement."  (Id.)

### G.  Northcott's Subsequent Investigation and Actions

After Ms. Wall received Ms. Miles' email, she contacted CFO Brian Schwen, who

contacted attorney Matthew Pfohl to conduct an investigation. (Pfohl Aff. ¶ 3 [Doc. No. 17]; Wall Dep. at 47.) On February 7, 2012, Ms. Miles was informed that Northcott had hired Mr. Pfohl to investigate her allegations. (Miles Aff. ¶ 7 [Doc. No. 23].) Shortly after, Ms. Miles became concerned because she learned that Mr. Pfohl was a former employee of the company and the husband of one of the owners. (Id.) Based on this information, Ms. Miles did not expect an impartial investigation. (Id.)

Mr. Pfohl began his investigation by reviewing Ms. Miles' February 6 email and scheduling an interview. (Pfohl Aff. ¶ 3.) He also scheduled interviews with Mr. Raja, Ms. Wall, Mr. Schwen, Carrie Bushman, Susan Jespersen, and Mike Welcher. (Id. ¶¶ 3, 6.) On February 8, 2012, Mr. Pfohl met with Ms. Miles. (Id. ¶ 4; Miles Aff. ¶ 8.) Ms. Miles asked him if representing Northcott raised a conflict of interest, which Mr. Pfohl denied because he did not know Mr. Raja or Mr. Kirwin previously. (Miles Aff. ¶ 8.) Ms. Miles stated that Mr. Raja had been treating her differently based on her gender, disability, and previous discrimination complaints. (Id.; Pfohl Aff. ¶ 4.) She also asked Mr. Pfohl to remove Mr. Raja from the workplace or move her to a different department. (Miles Aff. ¶ 8.) After this meeting, Mr. Pfohl followed up with Ms. Miles several times. (Pfohl Aff. ¶ 5.) Ms. Miles repeated her previous concerns and forwarded him emails that she believed showed differential treatment. (Id.) Ms. Miles cooperated with Mr. Pfohl's investigation until February 15, 2012. (Id. ¶ 7.)

In his interview with Mr. Pfohl, Mr. Raja said that he did nothing wrong. (Raja Dep. 77-78.) Mr. Pfohl described the allegations as Ms. Miles "being picked on" along with "a lot of other emotional type statements." (Id. at 77.) On February 15, 2012, Mr. Pfohl

sought Ms. Miles' further assistance, but she declined and directed Mr. Pfohl to contact her attorney, Clayton Halunen, for all future communication. (Pfohl Aff. ¶ 7.) On February 21, 2012, Mr. Pfohl spoke with Mr. Halunen about the ongoing harassment investigation. (Id. ¶ 8.) Mr. Halunen stated that the investigation was a "waste of time," that he was "putting a lawsuit together," and that Ms. Miles was "done working there anyway." (Id. ¶ 9.)

Mr. Pfohl concluded his investigation because Ms. Miles' refusal to cooperate made further investigation into her allegations impractical. (Pfohl Aff. ¶ 10.) On February 22, 2012, he presented his findings to Mr. Schwen. (Id. ¶ 11.) These findings were based on information obtained from interviewing Ms. Miles, Mr. Raja, Mr. Schwen, Ms. Wall, Ms. Bushman, Ms. Jesperson, and Mr. Welcher; relevant emails and other documents provided by all parties; review of the company's employee conduct policies and procedures; and other information Mr. Pfohl gathered as part of his investigation. (Id.) Mr. Pfohl did not provide Northcott with a copy of the investigation results. (Raja Dep. at 79.) Mr. Schwen communicated Mr. Pfohl's findings to Mr. Kirwin. (Id. at 82.) After the investigation, Ms. Wall was not aware of any actions taken by Northcott to remedy the issues concerning Mr. Raja. (Wall Dep. at 51-52.)

### H. Ms. Miles' Medical Leave and Departure

On February 11, 2012, Ms. Miles requested medical leave, which began approximately two days later. (Ex. 7 to Aff. of Ross D. Stadheim [Doc. No. 21-7]; see Ex. F to Aff. of Kevin M. Mosher [Doc. No. 16-1].) While on leave, Ms. Miles saw her emotional well-being improve and knew that she could not return to working under Mr. Raja. (Miles Dep. at 31, 189.) Ms. Miles submits that before Mr. Raja became her

supervisor, she was a strong, independent woman.  (Miles Aff. ¶ 10.)  Allegedly due to his

repeated harassment and discrimination, Ms. Miles was prescribed antidepressants, had

anxiety attacks, could not sleep, and cried daily in the days and weeks leading up to her last

day of work.  (Id.; Miles Dep. at 30-31.)  Ms. Miles alleges that, following a day where Mr.

Raja announced that she would not be working on a particular project in front of the team,

she felt suicidal and drove fast into a ditch.  (Miles Aff. ¶ 6.)  Ms. Miles testified that Mr.

Raja "ripped [her] of everything [she] had" and "stripped [her] of every piece of self

confidence [she] had by telling me how I did everything wrong and I was no good."  (Miles

Dep. at 75.)

On April 2, 2012, Ms. Miles asked Northcott to remove Mr. Raja from the

workplace, stating that she would come back from her medical leave if they did so.  (Miles

Aff. ¶ 9.)  Northcott refused this proposal.  (Id.)

On April 14, 2012, Ms. Miles emailed an AmericInn franchisee, expressing her

disappointment that Mr. Raja had not contacted her while on medical leave.  (Ex. G to Aff.

of Kevin M. Mosher [Doc. No. 16-1].)  Ms. Miles wrote, "I do feel bad because Raja feels

that I can be replaced very easy and doesn't believe in me having relationships with my

owners or GM's.  I disagree, but my thoughts don't count I guess.  We just don't see eye to

eye.  I haven't heard a word from him or my team since I left.  That hurts a little!"  (Id.)

On April 23, 2012, Ms. Miles informed Ms. Wall by email that she would not return

to Northcott because of its "hostile work environment" and its "failure to provide an

accommodating work environment."  (Ex. X to Aff. of Kevin M. Mosher [Doc. No. 16-2].)

Ms. Wall responded the next day, stating that Northcott "has taken the appropriate steps to

address your concerns," but it needed to know how Ms. Miles would like Northcott to accommodate her work environment if she intended to return. (Id.) Ms. Wall further wrote, "if it is your desire not to return to work, please contact me to make arrangements to return company property." (Id.)

On May 9, 2012, Ms. Miles received correspondence from Ms. Wall, titled "Absences." (Ex. F to Aff. of Kevin M. Mosher [Doc. No. 16-1].) This letter confirmed that other than an email on April 23, 2012, Ms. Miles had not indicated that she did not intend to return to work. (Id.) It further stated:

> To be clear, we consider you to be a current employee and have maintained your status on our payroll accordingly. Should you require any medical or other accommodation(s) so that you can satisfactorily perform the essential duties of your position, please contact me so that we can discuss the matter. We are entirely willing to work with you and implement any reasonable accommodations that you and/or your medical provider deem necessary so that you can perform your job.

(Id.) (emphasis in original). This letter gave Ms. Miles until noon on May 11, 2012 to return to work. (Id.)

Ms. Miles felt compelled to resign from her employment. (Miles Dep. at 79.) On May 10, 2012, she emailed Ms. Wall the following:

> As you are aware, I have endured Mr. Raja's harassment and discriminatory practices for well over a year. I have pleaded with you as well as other management to address Mr. Raja's conduct yet the treatment has been allowed to continue. No investigation was conducted nor was any corrective action taken to stop this abuse. Mr. Raja's harassment has caused my physical and mental health to decline considerably to the point that my physician advised me to remove myself from this hostile work environment. As you are aware, Mr. Raja has abused other female employees yet the company continues to protect him. Although I love my job and would like to return, I cannot do so given the current work environment. Therefore, I must tender my resignation effective immediately.

(Ex. 12 to Aff. of Ross D. Stadheim [Doc. No. 21-12].)  Northcott replaced Ms. Miles with a woman after Ms. Miles served her complaint.  (Raja Aff. ¶ 7 [Doc. No. 18].)

## I.  Mr. Raja's Alleged Discrimination Against Other Female Employees

Mary Tjenstrom is a former Northcott employee whom Mr. Raja supervised.  (Dep. of Mary Antoinette Tjenstrom at 8, 11 [Doc. No. 22-7].)  Ms. Tjenstrom worked in Guest Relations from 2006 until her termination in August 2011.  (Id.)  She was fired shortly after she complained to Ms. Wall about three incidents in which Mr. Raja allegedly shouted at her, making her fear for her well-being and forcing her to tears.  (Id. at 26-27, 50; Wall Dep. at 65.)  Ms. Wall and Mr. Raja cited performance issues as the reason for Ms. Tjenstrom's termination.  (Wall Dep. at 65; Raja Dep. at 97.)

Ms. Wall did not investigate or respond to Ms. Tjenstrom's complaints.  (Wall Dep. at 50-51.)  Ms. Tjenstrom stated that Mr. Raja's actions were discriminatory against women: he allegedly yelled at women exclusively, offered to help only male subordinates, set unobtainable goals for Ms. Tjenstrom and Ms. Miles, and only mentored and coached male subordinates.  (Tjenstrom Dep. at 53-56.)  Ms. Tjenstrom did not witness Mr. Raja yell at or intimidate any male co-workers.  (Id. at 47.)  Ms. Tjenstrom recalled that Mr. Raja favored Jay Breimhorst in particular by coaching him and giving him obtainable goals.  (Id. at 45-46.)

When asked at her deposition how Mr. Raja made her feel during her employment with Northcott, Ms. Tjenstrom became emotional and cried.  (Id. at 73.)  She described that Mr. Raja's actions deflated her as a person, stripped her of confidence, and made her feel

disrespected.  (Id. at 73-75.)  Ms. Tjenstrom thought Mr. Raja was an intolerable supervisor whom she could not tolerate past August 2011 much longer:

> Q:    If you had not been terminated, would you have been able to continue simply putting up with Raja's treatment?
>
> A:    I was bound and determined to.  But I don't think that I could have.
>
> Q:    Okay.  Would you characterize it as being unbearable?
>
> A:    Yes.
>
> Q:    Would you agree with Kim Miles if she was characterizing it as unbearable?
>
> A:    Yes.

(Id. at 66-67.)

Mr. Raja allegedly targeted other women at Northcott as well.  Team members could hear and see Mr. Raja yelling at other women in his office.  (Tjenstrom Dep. at 69.)  Ms. Tjenstrom witnessed Ms. Miles and Carrie Bushman crying in the bathroom because of Mr. Raja's actions.  (Id. at 69.)  Ms. Tjenstrom also heard that Mr. Raja made Ms. Heger's life "pretty miserable."  (Id. at 61.)  After Ms. Heger learned of Mr. Raja's treatment of Ms. Miles, she allegedly pulled Ms. Miles into the bathroom, informed her that she was experiencing similar treatment, and coached Ms. Miles for any upcoming meetings with Mr. Raja.  (Miles Dep. at 181-82.)

Ms. Miles alleges that Mr. Raja primarily raised his voice at women and told them to stop talking.[3]  For example, Mr. Raja told Ms. Miles to be quiet on two occasions in August

---

[3] Ms. Miles recalled one situation in which Mr. Raja raised his voice at and told Sean Ellison, a Business Manager, to stop talking.  (Miles Dep. at 43.)  Ms. Miles recalled

2011, once in a business manager meeting and once in his office privately.  (Id. at 42.)  Ms. Miles witnessed Mr. Raja direct Ms. Heger to stop talking.  (Id.)  Mr. Raja also allegedly told Ms. Miles that Ms. Tjenstrom "didn't know when to shut up."  (Id. at 27.)  And once, at an office party for a new business manager, Mr. Raja allegedly asked Scott Doble, "how would you like to have these two women with their mouths living with you," referring to Ms. Miles and Ms. Tjenstrom in their presence.  (Id. at 25.)  Further, Mr. Raja allegedly smirked while embarrassing women at meetings, saying things like "you know better than that" and "that was a stupid question."  (Id. at 45-46.)

## III.  DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Id.  In considering a motion for summary judgment, the court views the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  Khoury v. Group Health Plan, Inc., 615 F.3d 946, 952 (8th Cir. 2010).  The

---

another situation in which Mr. Raja raised his voice at Ron Burgett, a Vice President. (Id. at 47.)

moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  Id.  The party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Id.

### B.  Sex Discrimination Claim

To succeed on a sex discrimination claim under the Minnesota Human Rights Act, a plaintiff must show discrimination because of sex.  MINN. STAT. § 363A.08, subd. 2 (2012). A claim of sex discrimination may be established through direct or indirect evidence. Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 907 (8th Cir. 2006).  Direct evidence is evidence that shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  Id.  Where the plaintiff has direct evidence of discrimination, the plaintiff simply submits her evidence to the fact finder.  Darke v. Lurie Besikof Lapidus & Co., LLP, 550 F. Supp. 2d 1032, 1040-41 (D. Minn. 2008).

In the absence of direct evidence, a plaintiff may rely on the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). Hervey v. Cnty. of Koochiching, 527 F.3d 711, 719 (8th Cir. 2008).  Under this framework, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was treated differently from similarly situated males.  Hawks v. J.P. Morgan Chase Bank , 591 F.3d

1043, 1049 (8th Cir. 2010).  The fourth element can also be met if the employee provides "some other evidence that would give rise to an inference of unlawful discrimination."  Id. Once a prima facie case is established, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its adverse employment action.  Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008).  If such reason is offered, then the presumption of discrimination raised by the prima facie case is eliminated and the plaintiff must show by a preponderance of the evidence that the employer's articulated reason was pretext for discrimination.  Id.  A genuine issue of material fact at any stage of the analysis is sufficient to defeat summary judgment.  Id.

### 1. Direct Evidence

Ms. Miles has not provided direct evidence of gender discrimination.  In opposing summary judgment, Ms. Miles relies on the "record as a whole" for direct evidence of sex discrimination.  (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 26 [Doc. No. 20].)  The record, at best, reflects her allegation that Mr. Raja once stated at an office party, "how would you like to have these two women with their mouths living with you," referring to Ms. Miles and Ms. Tjenstrom in their presence.  (Miles Dep. at 25.)  The Court finds that this statement, although circumstantial evidence of gender discrimination, is not direct evidence.  Direct evidence must point clearly to the presence of an illegal motive.  Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).  Direct evidence does not include "stray remarks in the workplace, statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process."  Clearwater v. Indep. Sch. Dist. No. 166, 231 F.3d 1122, 1126 (8th Cir. 2000).  Here, Mr. Raja's statement is a stray comment.

Moreover, Ms. Miles has not shown any specific link between the statement and any decision making at Northcott.  See Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P., 444 F.3d 961, 966 (8th Cir. 2006) (stating that remarks unrelated to the decisional process are not direct evidence of discrimination).  Thus, the Court finds that this statement is insufficient to defeat summary judgment.

Because Ms. Miles does not present direct evidence of Mr. Raja's discrimination on the basis of sex, the Court analyzes her sex discrimination claim under McDonnell Douglas.

### 2.  Indirect Evidence

### a.  Prima Facie Case

Without direct evidence of discrimination based on sex, Ms. Miles must establish a prima facie case of sex discrimination under the McDonnell Douglas test.  To establish a prima facie case of discrimination, Ms. Miles must show that: (1) she is a member of a protected class, (2) she was qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was treated differently from similarly situated males.  See Hawks, 591 F.3d at 1049.  The fourth element can also be met if she provides "some other evidence that would give rise to an inference of unlawful discrimination."  Id.

Of the four elements to a prima facie case, the parties only contest the latter two. Northcott argues that Ms. Miles never suffered an adverse employment action, and that no material fact shows that Ms. Miles was treated disparately.  (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 32 [Doc. No. 15].)  Northcott adds that even if Ms. Miles can prove all elements of a prima facie case, Northcott still not liable under the Ellerth/Faragher defense.  (Id. at 27.)  Ms. Miles responds that she suffered an adverse employment action

because she was constructively discharged, and the facts show disparate treatment. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 26-30 [Doc. No. 20].) Ms. Miles also contends that the Ellerth/Faragher defense does not apply, because she was not sexually harassed and she availed herself of all preventive and corrective opportunities. (Id. at 34.)

### i.  Constructive Discharge

A constructive discharge occurs when an employer renders the employee's working conditions intolerable, forcing the employee to quit. Johnson v. Bunny Bread Co., 646 F.2d 1250, 1256 (8th Cir. 1981). If an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge. Winbush v. State of Iowa by Glenwood State Hosp., 66 F.3d 1471, 1485 (8th Cir. 1995). An employee must give an employer a reasonable opportunity to work out a problem before quitting. West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995). The intolerability of working conditions is judged by an objective standard, not the employee's subjective feelings. Sanders v. Lee Cnty. Sch. Dist. No. 1, 669 F.3d 888, 893 (8th Cir. 2012).

Ms. Miles argues that she was subjected to Mr. Raja's badgering, harassment, and humiliation, which created intolerable working conditions for her at Northcott. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 28 [Doc. No. 20].) In support of Mr. Raja's discriminatory animus toward women, Ms. Miles submits that Mr. Raja repeatedly yelled at her and other female employees to be quiet, and he embarrassed them during meetings with underhanded comments. (Id.) Ms. Miles also alleges that Mr. Raja forced her to write, in the first person, a false performance action plan in her 2011 NAP. (Id.) Moreover, Mr. Raja allegedly stated during an office party, "how would you like to have these two women

[Ms. Miles and Ms. Tjenstrom] with their mouths living with you," referring to Ms. Miles and Ms. Tjenstrom in their presence.  (Id. at 29.)  Ms. Tjenstrom testified that Mr. Raja similarly humiliated and degraded her, and that Mr. Raja treated male employees preferentially.  (Id. at 29-30.)

In addition, the record shows that members of Northcott's management knew of Ms. Miles' complaints of sex discrimination during her employment.  See Burns v. McGregor Elec. Indus., Inc., 955 F.2d 559, 564 (8th Cir. 1992) (noting that the owner's participation in the harassment and the employee's complaints to supervisors showed that management knew of the harassment) (abrogated on other grounds).  Ms. Miles alleges that she first complained of discrimination in May 2011, when she told Mr. Raja her sense that he was "genderly harassing" her.  (Miles Dep. at 31-32, 34.)  Her second complaint of discrimination occurred in August 2011, when she reported to Jean Wall that Mr. Raja was harassing her and setting her up for termination.  (Wall Dep. at 30; Ex. 15 to Aff. of Ross D. Stadheim.)  Ms. Miles alleges that around this time, she also spoke with three vice presidents at Northcott about Mr. Raja's differential treatment.  (Miles Dep. at 70-71.) These complaints did not result in any formal investigation.  (Wall Dep. at 39-40.)  Ms. Miles' third complaint of discrimination occurred in February 2012, when she reported to Ms. Wall that Mr. Raja was "back at it again."  (Miles Dep. at 182.)  Her communications with Ms. Wall and Mr. Kirwin during this month reflected complaints about Mr. Raja's discrimination on the basis of her sex and disability.  (Id.; Ex. 6 to Aff. of Ross D. Stadheim.)  This third complaint resulted in Northcott's investigation of the matter via attorney Matthew Pfohl, a former employee of the company and the husband of one of the

owners.  (Miles Aff. ¶ 7.)

Given the submitted evidence of gender animus, Ms. Miles' complaints, and Northcott's responses, a reasonable jury could find that the allegedly continuing harassment and management's relative indifference rendered Ms. Miles' working conditions intolerable and forced her to quit.  Ms. Miles has made a prima facie showing of constructive discharge.

### ii.    Disparate Treatment

The Court also finds that Ms. Miles has made a prima facie showing of disparate treatment.  Circumstances giving rise to an inference of discrimination include the following evidence.  First, Ms. Miles submits that Mr. Raja repeatedly yelled at her and other female employees to be quiet, and he embarrassed them during meetings with underhanded comments.  (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 28 [Doc. No. 20].)  Mr. Raja also allegedly stated, "how would you like to have these two women [Ms. Miles and Ms. Tjenstrom] with their mouths living with you," referring to Ms. Miles and Ms. Tjenstrom in their presence.  (Id. at 29.)  Further, Ms. Tjenstrom testified that Mr. Raja similarly humiliated and degraded her, and that Mr. Raja treated male employees preferentially.  (Id. at 29-30.)  A reasonable jury could find that these circumstances give rise to an inference of disparate treatment, and thus this element of a prima facie case is met.

### iii.    Ellerth/Faragher Defense

Under the Supreme Court's decisions in Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775 (1998), an affirmative defense can be asserted when no tangible employment action has been taken against the

23

employee, if the employer can prove by a preponderance of the evidence that: (1) the company "exercised reasonable care to prevent and correct promptly any sexually harassing behavior," and (2) the "employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Frieler v. Carlson Mktg. Grp., Inc., 751 N.W.2d 558, 570-71 (Minn. 2008) (applying Ellerth/Faragher defense in MHRA claim).

The Court finds that Northcott cannot meet the elements of this defense. First, Ms. Miles does not allege that she was sexually harassed. Rather, Ms. Miles alleges that she was subject to a hostile work environment under her supervisor, and was discriminated against based on her protected status as a female. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 35 [Doc. No. 20].) Second, Ms. Miles submitted evidence that she took advantage of corrective opportunities provided by the employer. Namely, she made three separate complaints—in May 2011, August 2011, and February 2012—to Northcott about Mr. Raja's differential treatment of her on the basis of sex. Accordingly, the Ellerth/Faragher defense does not bar Ms. Miles' claim of sex discrimination.

Because Ms. Miles has established a prima facie case of sex discrimination, the burden of production shifts to Northcott to articulate a legitimate, non-discriminatory reason for its adverse employment action.

### b. Legitimate, Non-Discriminatory Reason

Northcott argues that Mr. Raja's actions toward Ms. Miles are legitimate and non-discriminatory. (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 32-33 [Doc. No. 15].) Specifically, Mr. Raja believed that Ms. Miles' work performance needed improvement.

(Id. at 33.)  Regarding projects that he took from her, Mr. Raja claims that she was not making satisfactory progress.  (Id.)  Regarding emails sent by Mr. Raja to Ms. Miles about workplace protocol, Mr. Raja maintains that as her supervisor, he is responsible for her workplace communications.  (Id.)  And regarding his calls to her on vacation for work-related reasons, Northcott submits that Ms. Miles was a manager with responsibilities outside the normal workday.  (Id.)

The Court finds that Northcott has articulated legitimate and non-discriminatory reasons for Mr. Raja's actions, and thus the burden shifts back to Ms. Miles to show that these reasons are pretext for sex discrimination.

### c.  Pretext

Ms. Miles appears to argue that Northcott's allegedly legitimate and non-discriminatory reasons are actually pretext for sex discrimination, because Northcott was repeatedly on notice of Mr. Raja's alleged discrimination yet did not respond on multiple occasions; and when it finally began an investigation, Northcott hired an investigator with questionable impartiality to the parties.  (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 31-33 [Doc. No. 20].)

Northcott contends that Mr. Raja's actions toward Ms. Miles do not show pretext because he fired eight men and one woman; promoted Jessica Rogers in January 2012 to be the Business Team Lead and Ms. Miles' supervisor; and hired nine people, six of whom were women.  (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 33 [Doc. No. 15].)

The allegations of Mr. Raja's differential treatment toward women, Northcott's notice of this issue, Northcott's months-long delay in investigating Ms. Miles' complaints,

and its eventual hiring of a questionably impartial investigator, create a genuine issue of material fact. These facts, if proven at trial, could lead a reasonable jury to find that Northcott's proffered reasons for Mr. Raja's actions are pretext for sex discrimination.

In summary, Ms. Miles has not shown direct evidence of Mr. Raja's discrimination against her on the basis of sex. But under the <u>McDonnell Douglas</u> framework, Ms. Miles has made a prima facie case and presented sufficient evidence to create an issue of fact that Northcott's articulated reasons for Mr. Raja's conduct were pretextual. <u>See</u> <u>McDonnell</u>, 411 U.S. at 802-04. Accordingly, the Court denies Defendant's motion for summary judgment on the sex discrimination claim.

## C. Disability-Related Claims

Ms. Miles raised claims under the Minnesota Human Rights Act for disability discrimination and failure to accommodate her disability. (Compl. ¶¶ 32-39.) She may use direct or circumstantial evidence to prove her claims. <u>See</u> <u>Kammueller v. Loomis, Fargo & Co.</u>, 383 F.3d 779, 784 (8th Cir. 2004). Using circumstantial evidence to establish her prima facie case, Ms. Miles must present evidence sufficient to permit a reasonable jury to conclude that she was: (1) disabled within the meaning of the MHRA, (2) qualified to perform the essential functions of the job with or without reasonable accommodation, and (3) suffered an adverse employment action because of her disability. <u>See</u> <u>id.</u> Under the failure to accommodate claim, Ms. Miles must also show that Northcott knew of, and failed to reasonably accommodate, her disability. <u>See</u> MINN. STAT. § 363A.08, subd. 6.

### 1. Disability Discrimination Claim

In the absence of direct evidence of disability discrimination, the Court applies the

McDonnell Douglas burden-shifting analysis.  See Kammueller, 383 F.3d at 784.

### a. Prima Facie Case

### i. Disabled Under the MHRA

The MHRA provides, in relevant part, that an individual is disabled if he or she has a "physical, sensory, or mental impairment which materially limits one or more major life activities."  MINN. STAT. § 363A.03, subd. 12.  The Americans with Disabilities Act defines major life activities to include hearing.  42 U.S.C. § 12102(2)(A) (2013).  A disease that materially affects an individual's hearing is a disability under the MHRA.[4]

The parties do not contest whether Ms. Miles is disabled under the MHRA.  (See Raja Dep. at 83; Wall Dep. at 40.)  Approximately ten years ago, Ms. Miles was diagnosed with Meniere's disease in her left ear, in which she lost all hearing.  (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 37 [Doc. No. 20].)  In January 2012, Ms. Miles was diagnosed with Meniere's disease in her right ear.  (Id.)  As a result, Ms. Miles lost seventy to seventy-five percent of her hearing in the right ear.  (Id.)  Thus, the Court finds that Ms. Miles has met this element of a prima facie disability discrimination claim.

### ii. Essential Functions with Reasonable Accommodation

The determination of whether an employee is qualified to perform the essential functions of a job involves a two-step inquiry.  Eldredge v. City of St. Paul, 809 F. Supp. 2d 1011, 1030 (D. Minn. 2011) (citing Burchett v. Target Corp., 340 F.3d 510, 517 (8th Cir. 2003)).  The employee must show that she meets the necessary prerequisites for the job, and

---

[4] The MHRA's "materially limits" standard is less stringent than the ADA's "substantially limits" standard.  Liljedahl v. Ryder Student Transp. Servs., Inc., 341 F.3d 836, 841 n.3 (8th Cir. 2003).

then she must demonstrate that she can perform the essential functions, with or without reasonable accommodation. <u>Eldredge</u>, 809 F. Supp. 2d at 1030. If the employee establishes that she cannot perform the essential functions of the job without accommodation, she must also make a facial showing that reasonable accommodation is possible and that the accommodation will allow her to perform the essential functions of the job. <u>Id.</u>

The parties' memoranda are silent on this issue. The Court assumes that the parties do not contest whether Ms. Miles is qualified to perform the essential functions of her job, and therefore finds that this element of a prima facie case is met.

### iii. Adverse Employment Action

Ms. Miles must show that she suffered an adverse employment action because of her disability. An adverse employment action is one that causes a material change in the terms or conditions of employment, such as a termination, a constructive discharge, a cut in salary or benefits, or a change that affects an employee's future career prospects. <u>Clegg v. Ark. Dep't of Corr.</u>, 496 F.3d 922, 926 (8th Cir. 2007). Minor changes in working conditions, even if they are unpalatable or unwelcome, do not qualify as adverse employment actions, nor do complaints or negative comments, unless they lead to a material change in employment status. <u>Id.</u>

Northcott argues that Ms. Miles never suffered an adverse employment action because of her disability. (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 34 [Doc. No. 15].) Northcott submits Ms. Miles' testimony that she could not identify a situation in which a non-disabled employee was treated more favorably. (<u>Id.</u>)

Ms. Miles, however, makes a prima facie showing of a constructive discharge. <u>See</u>

part III(B)(2)(a)(i).  In addition, she provided evidence that shortly after she informed Mr.

Raja of her diagnosis of Meniere's disease in her right ear, Mr. Raja stated that she should

quit and removed Ms. Miles from her extra projects.  (Raja Dep. at 101-102; Miles Dep. at

64.)  Mr. Raja also took away some of the properties assigned to Ms. Miles.  (Miles Dep. at

64.)  Ms. Miles alleges that she had never had projects taken away from her previously.

(Id.)  Nor had she discussed with Mr. Raja the possibility of losing her properties.  (Id.)

These facts, if proven at trial, could lead a reasonable jury to find that Ms. Miles suffered an

adverse employment action due to her disability.  Thus, Ms. Miles has satisfied her burden

on this element of a prima facie case.

### b.  Legitimate, Non-Discriminatory Reason

Because Ms. Miles has established a prima facie case, Northcott must rebut the

presumption of discrimination by articulating a legitimate, non-discriminatory reason for the

adverse employment action.  See Kammueller, 383 F.3d at 788.  In the context of opposing

Ms. Miles' sex discrimination claim, Northcott cites Mr. Raja's belief that Ms. Miles was

not making satisfactory progress toward completing her projects as a legitimate, non-

discriminatory reason.  (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 33 [Doc. No. 15].)

Assuming that Northcott would argue the same in the context of Ms. Miles' disability

discrimination claim, the Court finds that Northcott would meet its burden here.

### c.  Pretext

Neither party's memorandum addresses whether Northcott's proffered reasons for

Ms. Miles' adverse employment action are pretext with respect to her disability

discrimination claim.  The Court notes that the record raises a material question of fact as to

whether Northcott's explanation is pretext. Namely, Ms. Miles presents evidence that one day after informing Mr. Raja of her second diagnosis of Meniere's disease, Mr. Raja stated that she should quit and removed her from extra projects. (Raja Dep. at 101-102; Miles Dep. at 64.) Mr. Raja also took away some of the properties assigned to Ms. Miles, a possibility that Ms. Miles and Mr. Raja had not discussed previously. (Miles Dep. at 64.) Later that month, Mr. Raja removed Ms. Miles from her video shoot project. (Id. at 195.) Ms. Miles states that before she informed Mr. Raja of her Meniere's diagnosis in January 2012, she had never had projects taken away from her. (Id. at 64.) Such a showing is sufficient to survive summary judgment.

Because Ms. Miles established a prima facie case of disability discrimination, and because the record raises genuine issues of material fact as to whether Northcott's articulated reason was pretext, the Court denies Defendant's motion for summary judgment on Ms. Miles' disability discrimination claim.

## 2. Failure to Accommodate Claim

The Court's analysis of a prima facie case of disability discrimination, supra part III(C)(1)(a), applies to Ms. Miles' failure to accommodate claim. To show that an employer failed to participate in an interactive process to devise a reasonable accommodation, a disabled employee must show: (1) the employer knew about the employee's disability, (2) the employee requested accommodation or assistance for her disability, (3) the employer did not make a good-faith effort to assist the employee in seeking accommodation, and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Cravens v. Blue Cross and Blue Shield of Kansas City, 214 F.3d 1011, 1021 (8th Cir.

2000).

Northcott argues that Ms. Miles did not request a reasonable accommodation for her hearing loss, because she only asked to work from home. (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 35-36 [Doc. No. 15].) Northcott also argues that Ms. Miles failed to engage in the interactive process, because on no fewer than six occasions, she refused to discuss Mr. Raja's and Ms. Wall's offers to accommodate her disability, opting instead for medical leave. (Id. at 36-38.)

Ms. Miles, however, introduced evidence that she asked for a reasonable accommodation on three occasions. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 40 [Doc. No. 20].) First, before her diagnosis of Meniere's disease in her right ear, she asked Mr. Raja to sit next to her on her right side during team meetings because she had difficulty hearing in large rooms. (Miles Dep. at 54.) Second, also before her diagnosis of Meniere's disease in her right ear, Ms. Miles asked Mr. Raja for permission to listen to webinars in her cubicle, where she had access to an earbud. (Id. at 62.) Third, immediately after she was diagnosed with Meniere's disease in her right ear, Ms. Miles asked Ms. Wall and Mr. Raja for an accommodation to work from home. (Wall Dep. at 53-54; Raja Dep. at 84.) All of these requests were denied.

In addition, Ms. Wall and Mr. Raja stated that they did not engage in any interactive process with Ms. Miles. Ms. Wall testified at her deposition:

> Q: Did you ever, did you or Mr. Raja ever engage in an interactive process to determine how she could continue to work for Northcott while dealing with her disability?
>
> A: I'm not—I did not.

(Wall Dep. at 54.)  Mr. Raja echoed Ms. Wall's answer:

> Q:     Did you ever engage in any sort of interactive process with Ms. Miles to determine whether working at home could be an option or did you just blanketly say no?
>
> A:     Blanketly say no.  I wanted her to work from the office, yes.
>
> . . .
>
> Q:     Did you ever engage in an interactive process with Ms. Miles to determine whether she could, in fact, work from home and still complete all of her tasks?
>
> A:     Short answer, no.
>
> Q:     Did you ever consider restructuring Ms. Miles'[sic] job to accommodate her?
>
> A:     No.
>
> Q:     Did you ever consider maybe a part-time or a modified work schedule to accommodate her disability?
>
> A:     No.

(Raja Dep. at 88.)

On these facts, a reasonable jury could find that Northcott did not make a good-faith effort to assist Ms. Miles in seeking an accommodation.  Moreover, a reasonable jury could find that working from home was a reasonable accommodation—that is, working from home might not impose an undue hardship on Northcott.  Alternatively, a reasonable jury could find that Northcott did not know about Ms. Miles' disability before January 2012, which would absolve Northcott from making accommodations.[5]

_____

[5] Mr. Raja testified that he first learned of Ms. Miles' hearing disability in January 2012,

Because genuine issues of material fact remain, the Court denies summary judgment on Defendant's failure to accommodate claim.

## D. Hostile Work Environment Claim

In order to establish an objectively hostile work environment, the offending conduct must have been sufficiently severe or pervasive.  Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 573 (8th Cir. 1997).  More than a few isolated incidents are required.  Id.  A workplace permeated with "discriminatory intimidation, ridicule, and insult" is sufficiently severe to establish a hostile work environment.  Id.  The environment must be more than merely offensive, immature or unprofessional; it must be extreme.  Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 980 (8th Cir. 2003).  If the plaintiff does not subjectively perceive the environment as abusive, then the conduct has not altered the conditions of employment.  Id.

Here, Ms. Miles introduced evidence that Mr. Raja allegedly engaged in numerous incidents of offensive conduct against Ms. Miles and other women working at Northcott. For example, she submits that Mr. Raja repeatedly yelled at her and female colleagues to be quiet, and he embarrassed them during meetings with underhanded comments.  (Miles Dep. at 45-46.)  Ms. Miles also alleges that Mr. Raja stated at an office party, "how would you like to have these two women with their mouths living with you," referring to Ms. Tjenstrom and Ms. Miles in their presence.  (Id. at 25.)  Ms. Miles further submits that he forced her to write, in the first person, a false performance action plan in her 2011 NAP. (Raja Dep. at 68:6-10.)  Ms. Tjenstrom's deposition testimony supported many of these

shortly before her diagnosis of Meniere's disease in her right ear.  (Raja Dep. at 84.)  Ms. Miles, however, testified that before January 2012, she had explained her hearing loss in her left ear to Mr. Raja and requested accommodations accordingly.  (Miles Dep. at 62-63.)

facts, as she described her own similar experience with Mr. Raja. (Tjenstrom Dep. at 53-56.)

Furthermore, Ms. Miles introduced evidence suggesting that Northcott did not take her complaints seriously. For instance, Northcott's management did not investigate her first two complaints about Mr. Raja's alleged discriminatory actions. (Wall Dep. at 39-40, 46.) As for the one investigation that occurred after Ms. Miles' third complaint, the record shows that a former Northcott employee and the husband of one of its owners conducted this investigation, thus raising concerns of questionable impartiality. (Miles Aff. ¶ 7.)

On such evidence, if proven at trial, a reasonable jury could find a hostile work environment. Accordingly, the Court denies Defendant's motion for summary judgment on Ms. Miles' hostile work environment claim.

### E. Reprisal Claim

The Minnesota Human Rights Act makes it illegal for an employer to engage in any reprisal against an employee who opposes an unlawful employment practice. MINN. STAT. § 363A.15. A reprisal includes, but is not limited to, any form of intimidation, retaliation, or harassment. Id. Under the MHRA, a reprisal claim is analyzed under the McDonnell Douglas burden-shifting framework. Chivers v. Wal-Mart Stores, Inc., 641 F.3d 927, 932 (8th Cir. 2011).

### 1. Prima Facie Case

To establish a prima facie case of reprisal discrimination, the plaintiff must show: (1) a statutorily protected activity, (2) an adverse employment action, and (3) a causal connection between the two. Id.

Northcott argues that Ms. Miles cannot make a prima facie case because she neither engaged in a statutorily protected activity nor suffered an adverse employment action. (Def.'s Mem. in Supp. of its Mot. for Summ. J. at 39 [Doc. No. 15].) Northcott characterizes Ms. Miles' complaints as concerning "personality differences, petty workplace disputes and different understandings of workplace protocol," which Northcott contends are not protected activity. (Id. at 40.)

Ms. Miles responds that she engaged in a statutorily protected activity by making her discrimination and harassment complaints against Mr. Raja; that she was constructively discharged; and that a causal connection between the two exists. (Pl.'s Mem. in Opp'n to Def.'s Mot. of Summ. J. at 46-48 [Doc. No. 20].)

Regarding the first element of a prima facie case, Ms. Miles' multiple complaints alleged more than mere "personality differences, petty workplace disputes, and different understandings of workplace protocol," as Northcott depicts. The record shows that her first complaint addressed whether Mr. Raja was "genderly harassing" her, to which he allegedly responded, "[n]ow I have to go tell Paul [Kirwin, CEO] and Brian [Schwen, CFO] that you think I'm harassing you." (Miles Dep. at 103.) Her second complaint, directed to Ms. Wall, addressed gender discrimination specifically. (Miles Dep. at 166.) Her third complaint, again to Ms. Wall, addressed Mr. Raja's alleged discrimination based on Ms. Miles' sex and disability. (Ex. 6 to Aff. of Ross D. Stadheim.) These facts, if proven at trial, show that Ms. Miles engaged in a statutorily protected activity.

The Court also finds that Ms. Miles has made a prima facie showing of a constructive discharge, as discussed previously. See part III(B)(2)(a)(i).

Finally, there is sufficient evidence in the record from which a reasonable jury could find that Ms. Miles engaged in statutorily protected conduct, that she suffered a constructive discharge, and that there was a causal connection between them.

Ms. Miles has established a prima facie case for reprisal discrimination. Consequently, the burden shifts to Northcott to show a legitimate, nonretaliatory reason for its adverse employment action.

### 2. Legitimate, Non-Discriminatory Reason

Assuming that Northcott would submit the same reasons as it did in the context of opposing Ms. Miles' disability and sex discrimination claims—that Mr. Raja found Ms. Miles' performance lacking—the Court finds that Northcott would meet its burden here. (See Def.'s Mem. in Supp. of its Mot. for Summ. J. at 27 [Doc. No. 15].)

### 3. Pretext

The Court notes that the record raises a material question of fact as to whether Northcott's explanation is pretext. Namely, Ms. Miles presents evidence that the timing and escalation of her three reports concerning Mr. Raja's alleged discrimination against her— whether on the basis of sex, disability, or both—correspond with her eventual request for medical leave and departure from Northcott. Such a showing is sufficient to survive summary judgment.

In summary, Ms. Miles has established a prima facie case of reprisal discrimination, and the record raises a genuine issue of material fact concerning pretext. Accordingly, the Court denies Northcott's motion for summary judgment on Ms. Miles' reprisal discrimination claim.

**IV.    ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, genuine

disputes of material fact preclude granting Northcott's motion for summary judgment.

**THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  Defendant's Motion for Summary Judgment [Doc. No. 13] is **DENIED**.


Dated:          August 7, 2013                              s/ Susan Richard Nelson
                                                                        SUSAN RICHARD NELSON
                                                                        United States District Court Judge